UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE

DAVID L. KELLEY and LINDA N. KELLEY,

                    Debtors.
_____/

DAVID L. KELLEY and LINDA N. KELLEY

                    Appellants,
v.                                    Case No.  3:06-cv-881-J-33TEM
                                       Bankr. No. 3:05-bk-13031-GLP

ALEXANDER G. SMITH, as Chapter 7
Trustee,
                    Appellee.
_____/

## ORDER

     This matter comes before the Court pursuant the Notice of

Appeal (Doc. # 1-2) filed by David L. Kelley and Linda N. Kelley

(collectively the "Debtors") in which the Debtors appeal the

following orders of the bankruptcy court entered on August 29,

2006: Findings of Fact and Conclusions of Law (B.R. Doc. # 60),

Order Sustaining in Part Trustee's Amended Objections to Debtors'

Claim of Exemptions (B.R. Doc. # 62), and Order Granting Trustee's

Motion for Turnover of Property to the Bankruptcy Estate (B.R. Doc.

# 61).[1]  This Court has considered the briefs of the parties and

_____

     [1] The Notice of Appeal states that it is filed by both Mrs.
and Mr. Kelley. (Doc. # 1.) However, in the "Appellants' Brief on
Appeal" (Doc. # 5) (emphasis added), counsel for Appellants states
that only Mrs. Kelley appeals the bankruptcy court's aforementioned
orders.  This Court does not agree that the appeal is on behalf of
Mrs. Kelley only.  Both Mr. and Mrs. Kelley filed the notice of
                                              (continued...)

the record below and determines that the Findings of Fact and Conclusions of Law of the bankruptcy court (B.R. Doc. # 60), as well as the related orders sustaining the Trustee's objections to exemptions (B.R. Doc. # 62) and granting turnover (B.R. Doc. # 61) should be **AFFIRMED.**

## I.   <u>FACTUAL BACKGROUND</u>

The following undisputed facts are contained in the bankruptcy court's Findings of Fact and Conclusions of Law (B.R. Doc. # 60). Mrs. Kelley purchased a whole life insurance policy from New York Life Insurance Company (the "Insurance Policy") on or about June 19, 1995. (<u>Id.</u> at 1.)  The Insurance Policy had a cash surrender value, and Mrs. Kelley could borrow money against the Insurance Policy. (<u>Id.</u>)  On August 20, 2003, Mrs. Kelley borrowed $9,000 under the Insurance Policy, and she deposited those funds into a joint checking account held by both Mr. and Mrs. Kelley (<u>Id.</u>)  The August 20, 2003, loan of $9,000 was subject to compound interest. (<u>Id.</u>)  Pursuant to the Insurance Policy, the loan had to be repaid before Mrs. Kelley's death or before surrender of the policy. (<u>Id.</u>) If the unpaid loan and accrued interest exceeded the total of the cash value and any dividend values, the Insurance Company was entitled to mail a cancellation notice to Mrs. Kelley. (<u>Id.</u> at 2.) All insurance under the Insurance Policy would end thirty-one days

---

[1](...continued)
appeal, the orders of the bankruptcy court now appealed apply to both Debtors, and this decision shall apply to both Debtors.

after the date on which the notice was mailed if the excess amount was not paid prior to then. (Id.)

On August 15, 2005, Mrs. Kelley paid the Insurance Company $8,897.40, which repaid the $9,000 loan in full.[2] (B.R. Doc. # 60 at 2.)

On October 12, 2005, the Debtors filed their voluntary petition under Chapter 7 of the Bankruptcy Code accompanied by their schedules A-J and statement of financial affairs (B.R. Doc. # 1.)[3]  On Schedule B, which lists the personal property of the Debtors, the Debtors listed the whole life Insurance Policy with New York Life Insurance Company and indicated that the cash surrender value of the Insurance Policy was $13,000. (B.R. Doc. 1 at 5.)[4]  In addition, the Debtors claimed the $13,000 cash surrender value of the Insurance Policy as exempt pursuant to 11 U.S.C. § 522(b)(2) on their Schedule C, which lists the exempt

---

[2]During her February 16, 2006 deposition, Mrs. Kelley testified that she made several small interest payments prior to paying the lump sum payment to the Insurance Company in the amount of $8,897.40. (Debtors' Dep. Tr. at 32:4-5.)

[3] The Debtors filed for protection from creditors under Chapter 7 of the United States Bankruptcy Code prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).  Accordingly, the provisions of BAPCPA shall not apply to this appeal and this Court has applied pre-BAPCPA law in rendering this opinion.

[4]The Debtors also noted on their Schedule B that the face value of the Insurance Policy was $100,000. (B.R. Doc. # 1 at 5.)

property of Debtors. (B.R. Doc. # 1 at 8.)  The bankruptcy court appointed Alexander G. Smith as Chapter 7 Trustee.

## II.   **THE TRUSTEE'S OBJECTION**

The Trustee filed a general objection to the Debtors' claim of exemptions on January 7, 2006: "The Trustee . . . objects to Debtors' Claim of Exemptions with respect to the bank deposits and personal property and in support says that the value of the property exceeds the maximum allowed under Florida law." (B.R. Doc. # 8).

On March 16, 2006, the bankruptcy court granted both Debtors a discharge under Chapter 7 of the Bankruptcy Code. (B.R. Doc. # 33.)[5]

After the entry of the discharge by the bankruptcy court, the Trustee filed an amended objection to the Debtors' claimed exemptions.  (B.R. Doc. # 35.)  The Trustee objected to the Debtors' claim that the cash surrender value of the Insurance Policy was an exempt asset. (Id.) In the Trustee's Amended Objection, the Trustee specifically argued that the transfer of $8,897.40 to repay the loan against the Insurance Policy was a conversion of non-exempt assets to exempt assets with the intent to

_____

[5] "The discharge eliminates the debtor's personal liability for all debts not excepted from discharge by section 523 or by some other statute.  It also serves as an injunction against efforts to collect such debts, except to the extent the debtor has reaffirmed a particular debt pursuant to the procedures in subsections 524(c) and (d)." Collier on Bankruptcy, §6-700 (15th Ed.) 700.05.

-4-

hinder, delay, or defraud creditors and $8,897.40 of the $13,000 cash surrender value of the Insurance Policy is therefore not exempt pursuant to Florida Statutes, § 222.30. (B.R. Doc. # 35 at 2.) The Trustee further argued that "[t]he exemption of the cash surrender value of the policy in the amount of $8,897.40 resulted from a fraudulent transfer or conveyance as provided in Chapter 726 of the Florida Statutes and $8,897.40 of the cash surrender value is therefore not exempt pursuant to Florida Statutes § 222.29." (B.R. Doc. # 35 at 2.)

In addition to the aforementioned objection to the Debtors' claimed exemption of the cash surrender value of the Insurance Policy, the Trustee filed a motion for turnover of the cash surrender value of the Insurance Policy to the bankruptcy estate. (B.R. Doc. # 40.)  In essence, the Trustee argued that the cash surrender value of the Insurance Policy was property of the Chapter 7 bankruptcy estate and subject to liquidation because the claimed exemption was invalid.  The Trustee deposed the Debtors on February 16, 2006.  Mrs. Kelley testified that she paid back the loan against the Insurance Policy in August of 2005 as follows:

> Q:    Why did you pay that loan back in August of '05?
> A:    Because that's part of my retirement and I thought that was exempt.  I had very little retirement.  My husband's 60 years old.
> Q:    All right.  What does exempt mean to you?
> A:    Exempt means that retirement is not going to be taken away from you at bankruptcy.

(Debtors' Dep. Tr. at 30:24-25, 31:1-8.)

The bankruptcy court held a hearing on the Trustee's objections and the Trustee's turnover motion on June 21, 2006. During the hearing, Mrs. Kelley similarly testified:

Q:  Why did you choose August 15, 2005 to pay back the loan?
A:  I was trying to preserve my very little retirement that I had.
Q:  And at the time that you paid back the loan, did you know that the cash surrender value of the whole life policy was exempt?
A:  Yes.
Q:  All right.  And at that time, what does exempt mean to you, what did it mean?
A:  It meant that my retirement could be preserved at the time of my bankruptcy.
Q:  So did you understand it to mean that your retirement wouldn't be taken away from you as the result of the bankruptcy then?
A:  Yes.

(B.R. Doc. # 79 at 10:17-25, 11:1-7.)

After the hearing, the bankruptcy court requested post-hearing memoranda.  The Debtors filed their memorandum in opposition to the Trustee's objection to exemptions on July 20, 2006 (B.R. Doc # 46) and the Trustee filed his memorandum in support of his objections to the Debtors' claimed exemptions on July 21, 2006. (B.R. Doc. # 49.)

On August 29, 2006, the bankruptcy court entered three orders in favor of the Trustee, each the subject of this appeal: (1) Findings of Fact and Conclusions of Law (B.R. Doc. # 60); Order Sustaining in Part Trustee's Amended Objections to Debtor's Claim of Exemptions (B.R. Doc. # 62); Order Granting Trustees Motion for Turnover of Property of the Bankruptcy Estate. (B.R. Doc. # 61.)

In its Findings of Fact and Conclusions of Law, the bankruptcy court determined: "Mrs. Kelley's exemption of the cash surrender value of the policy resulted from a fraudulent transfer or conveyance and therefore, the $8,897.40 of the cash surrender value is not exempt pursuant to Florida Statutes § 222.29." The bankruptcy court's orders sustaining the Trustee's objections to the debtor's exemptions and granting the Trustee's motion for turnover were predicated upon the bankruptcy court's finding that Mrs. Kelley converted non-exempt cash into an exempt insurance policy with the intent to hinder, delay, or defraud the creditors of the bankruptcy estate.

## III. **STANDARD OF REVIEW**

Upon entry of a final order by the bankruptcy court, a party may appeal to the district court pursuant to 28 U.S.C. § 158(a). The United States District Court functions as an appellate court in reviewing decisions of the United States Bankruptcy Court. In re Colortex Indus., Inc., 19 F.3d 1371, 1374 (11th Cir. 1994). This Court reviews de novo the legal conclusions of the bankruptcy court, In re JLJ, Inc., 988 F.2d 1112, 1116 (11th Cir. 1993). The standard of review employed by this Court in reviewing the bankruptcy court's findings of fact is the clearly erroneous standard of review described in Federal Rule of Bankruptcy Procedure 8013: "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  See In re Thomas, 883 F.2d 991, 994 (11th Cir. 1989), cert. denied, 497 U.S. 1007 (1990).  A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." Crawford v. Western Elec. Co., Inc., 745 F.2d 1373, 1378 (11th Cir. 1984)(citing United States Gypsum Co., 333 U.S. 364 (1948)).

The issues on appeal are both legal and factual: (1)  Whether the Debtors' transfer of non-exempt cash into the exempt Insurance Policy was done with the intent to hinder, delay, or defraud creditors; and (2) whether the bankruptcy court's order requiring the Debtors to turnover the $8,897.40 applies to both Debtors or solely to Mrs. Kelley.[6]

## IV. RELEVANT AUTHORITIES

Upon filing for bankruptcy under Chapter 7 of the Bankruptcy Code, essentially all property belonging to a debtor becomes

---

[6]The parties have supplied variant opinions concerning the identity of the issues on appeal that this Court must determine. The Debtors assert that the primary issue on appeal is whether it is fraudulent "for a debtor to pay a legitimate secured debt to a legitimate creditor prior to the filing of a bankruptcy petition." (Doc. # 10 at 2.)  On the other hand, the Trustee asserts that the issue on appeal is "[w]hether the Bankruptcy Court's finding that debtors transferred $8,897.40 of non-exempt assets into an exempt asset with the intent to hinder, delay or defraud a creditor is clearly erroneous." (Doc. # 8 at 5.)

property of the bankruptcy estate pursuant to 11 U.S.C. § 541. <u>See</u> <u>In re Barker</u>, 168 B.R. 773, 775 (Bankr. M.D. Fla. 1994).  The Bankruptcy Code directs the trustee to "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1).[7] However, Section 522 of the Bankruptcy Code allows a debtor to retain assets which are exempt from the bankruptcy estate. 11 U.S.C. § 522.[8]

Although the Bankruptcy Code discusses federal and state exemptions, Florida is one of the many states that has opted out of the federal exemptions, and the exemptions of Florida residents are a matter of Florida law.  <u>Barker</u>, 168 B.R. at 775 ("Florida citizens are not entitled to the federal exemptions . . . [i]nstead, a Florida citizen is entitled only to those exemptions allowed by state law, which exemptions are enumerated in the Florida Constitution (Article X, Section IV) and the Florida Statutes (Fla. Stat. Ann. § 222.201).").

The claimed exemption in dispute in this case is $8,897.40 of the $13,000 cash surrender value of the Insurance Policy.  Under

---

[7] The Trustee essentially liquidates the estate. "Liquidation is a form of relief afforded by the bankruptcy laws that involves collection, liquidation, and distribution of the nonexempt property of the debtor and culminates, if the debtor is an individual, in the discharge of the liquidation debtor." 6-700 <u>Collier on Bankruptcy</u> § 6-700 (15th Ed.) 700.01.

[8] Bankruptcy Rule of Procedure 4003(a) requires debtors to claim property as exempt in writing on Schedule C.

normal circumstances, the cash surrender value of a life insurance policy is an exempt asset.

> The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected from the benefit of such creditor.

Florida Statute Section 222.14.

However, in this case, Mrs. Kelley transferred a non-exempt asset ($8,897.40 in cash) into an exempt asset ($8,897.40 of the $13,000 cash surrender value of the Insurance policy) close in time to filing for bankruptcy, and stated that she did so with knowledge that the money would "not be taken away" and would be off limits to her creditors. (B.R. Doc. # 79 at 10:17-25, 11:1-7.)  Thus, the Trustee objected to the exemption.

In examining the Trustee's objection to the Debtors' claimed exemptions, the bankruptcy court considered some of the Florida Statutes concerning exemptions and fraudulent transfers, including Florida Statute Section 726.105, which states in part:

Transfers fraudulent as to present and future creditors:

(1)  a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation  was incurred, if the debtor made the transfer or incurred the obligation:

(a) With the actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to an insider of the debtor.

In addition, the bankruptcy court considered the related provisions of Florida Statute Section 222.29, which states that no exemptions are permitted for fraudulent transfers: "An exemption from attachment, garnishment, or legal process provided by this

Chapter is not effective if it results from a fraudulent transfer or conveyance as provided in Chapter 726."[9]  The bankruptcy court also considered Florida Statute Section 222.30(2), which mandates disallowance of exemptions arising from fraudulent transfers as follows: "any conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, where the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor."

## V.   THE BANKRUPTCY COURT'S ANALYSIS

The bankruptcy court considered Mrs. Kelley's testimony from the July 21, 2006, hearing (i.e., that she paid the $8,897.40 toward her Insurance Policy because the money could not be taken away from her upon filing for bankruptcy) to be direct evidence of intent to defraud creditors pursuant to Florida Statute Section 726.105(1)(a).

---

[9]In In re Hendricks, the court commented on Florida Statute Section 222.29 as follows: "By its language, § 222.29 clearly prohibits debtors from taking advantage of Florida's liberal exemptions when they fraudulently convert non-exempt assets into exempt assets, and with this in mind, Florida courts have not hesitated to deny debtors exemptions for life insurance policies, annuities, and other miscellaneous assets." 237 B.R. 821, 825 (Bankr. M.D. Fla. 1999).

In addition, the bankruptcy court concluded that Mrs. Kelley's transaction was tainted by several of the badges of fraud found in Florida Statute Section 726.105(2) and that her transaction was also marred by other relevant indicia of fraud. First, the bankruptcy court determined that Mrs. Kelley retained possession or control over the $8,897.40 after the transfer of that money to the Insurance Company because Mrs. Kelley retained the ability to borrow at least that much from the cash value of the Insurance Policy at any time.

Second, the bankruptcy court found that the Debtors were insolvent at the time of the transfer of the money to the insurance company. Third, the bankruptcy court considered the short time span between the repayment of the loan and the filing for bankruptcy (only two months) to be an indication of fraud. Fourth, the bankruptcy court noted that the "loan was not due and the insurance company had not asked that it be repaid." (B.R. Doc. # 60.) Accordingly, the bankruptcy court disallowed the claimed exemption as to $8,897.40 of the cash surrender value of the Insurance Policy and required the Debtors to turn over the $8,897.40 to the Trustee for liquidation.

## VI.  THE DEBTORS' ARGUMENTS

The Debtors assert that the bankruptcy court's determination that the $8,897.40 was not exempt from liquidation was wrongly decided. First, the Debtors assert that bankruptcy court's

decision ignored the fact that the Debtors received value for the expenditure of $8,897.40.   Second, the Debtors argue that the bankruptcy court erred in its application of the badges of fraud analysis.   Last, the Debtors assert that the orders of the bankruptcy court under appeal, and particularly the order requiring turnover of the $8,897.40 (B.R. Doc. # 61), should apply to Mrs. Kelley only because Mr. Kelley was not involved in the transaction with the Insurance Company.

### A.   Value Received by the Debtors

The Debtors assert that "the Bankruptcy Court erred as a matter of law when it determined that Linda N. Kelley did not receive the reasonably equivalent value in exchange for the loan repayment to the Life Insurance Company." (Doc. # 5 at 8.)   It should be noted, however, that the bankruptcy court made no factual or legal finding as to the Debtors' receipt of value or lack thereof.

The Debtors cite to the case of In re Lowery, 335 B.R. 199 (Bankr. M.D. Fla. 2005), in which the debtors paid approximately $51,500 toward a life insurance policy with a cash surrender value of $41,100, filed for bankruptcy, and claimed the cash surrender value of the policy as an exempt asset. Id. at 201-202.   A creditor in Lowery objected to the exemption, asserting that the debtors did not receive value for the money that they extended toward the life insurance policy. Id. at 202. The bankruptcy court in Lowery

overruled the creditor's objection to the claimed exemption and allowed the exemption upon finding that the debtors received value for their payment to the life insurance company: "the policy was neither worthless nor worth substantially less than what the debtors paid for it." <u>Id.</u> at 203.  The bankruptcy court pronounced its ruling as follows: "A payment, ordinarily for services actually rendered, can only be attacked as a fraudulent transfer on the theory that what the debtor received was either worthless or had value less than reasonable equivalent for the monies paid for the services." <u>id.</u> at 202 (citing <u>In re 21st Century Satellite Communications, Inc.</u>, 278 B.R. 577 (Bankr. M.D. Fla. 2002)."

However, in <u>Lowery</u>, the creditor's attack on the claimed exemption was limited to the allegation that the debtors did not receive value for their expenditure of funds.  The bankruptcy court began its analysis with Florida Statute Section 726.106(1)(1988), which states:

> Transfers fraudulent as to present creditors: (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

<u>Lowery</u>, 278 B.R. at 202 (citing Statute Section 726.106(1)).

This Court agrees that the Debtors in this case received value for the transfer of the $8,897.40 to the Insurance company because,

inter alia, the transfer increased the cash surrender value of the Insurance Policy. However, the fact that value was received for the money does not exonerate the transaction from fraud.[10]   The value received test for fraud is not the only test available for courts to apply in determining whether a fraudulent transaction has occurred.

A number of courts in this district have found fraud despite the debtor's receipt of value in the transaction. For instance, in In re Thomas, 172 B.R. 673, 675 (Bankr. M.D. Fla. 1994), the debtors sold their automobiles, which were free of liens, and prepaid their mortgage on their exempt homestead. Id. The bankruptcy court, however, disallowed the exemption to the extent it was augmented by the proceeds of the sale of the automobiles. The bankruptcy court in Thomas determined that "[t]he [d]ebtor's conversion of a non-exempt asset to an exempt asset, after consultation with an attorney, in anticipation of filing for relief under the Bankruptcy Code constituted an intentional hindrance or delay of the creditors and is, therefore, fraudulent." Id. It could not reasonably be argued that the debtor's received no value for the payment of their mortgage in the Thomas case, nevertheless, the bankruptcy court

---

[10] In the Lowery case, the creditor based its argument on the provisions of Florida Statute Section 726.106(1). In the present case, the Trustee raised his objection under the parallel statutory provision of Florida Statute Section 726.105, rather than Section 726.106. In addition, in Lowery, the creditor did not allege, as in this case, that the debtors' transaction was marred by the badges of fraud as stated in Florida Statute Section 726.105.

failed to discuss the debtor's receipt of value. Instead, the bankruptcy court focused on the evidence of actual intent to defraud creditors, and appropriately ended its analysis explaining:

> A significant body of case law exists regarding what constitutes evidence of intent for purposes of fraudulent conversions. The facts of this case render that question largely moot. When a debtor acknowledges transferring property with the intent of placing it beyond the reach of creditors, he demonstrates "an actual intent to hinder or delay a creditor."

Id. at 675.

In addition, the Debtors cite a number of cases in which the receipt of value was outcome determinative, such as In re Michelle's Hallmark, 219 B.R. 316 (Bankr. M.D. Fla. 1998), a case in which the court noted: "The inquiry concerning § 548(a)(2)(A) addresses whether the debtor gained a value reasonably equivalent to the disputed payments made to the defendant. A transfer may not be avoided pursuant to 548 if an economic benefit, either direct, or indirect, is conferred upon the debtor." Id. at 322 (citing In re Rodriquez, 895 F.2d 725, 727 (11th Cir. 1990)).

However, the present appeal is not procedurally comparable to the Michelle's Hallmark case nor is it controlled by Rodriquez because this case is not a Section 548(a) avoidance action.[11] The

---

[11] As explained in Rodriquez, under 11 U.S.C. § 548(a)(2), a trustee may void certain transfers made by the debtor within one year of filing for bankruptcy and while the debtor was insolvent. 895 F.2d at 727. Among the voidable transfers are those in which the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation. Id. The purpose of
(continued...)

rules for avoiding fraudulent transfers and objecting to exemptions are different, and it was not reversible error for the bankruptcy court to ignore case law interpreting Section 548 of the Bankruptcy Code.

Another particularly relevant case is <u>In re Miller</u>, 188 B.R. 302 (Bankr. M.D. Fla. 1995). In <u>Miller</u>, the debtor sold non-exempt property and used a part of the sale proceeds to pay off loans against the cash surrender value of two life insurance policies. <u>Id.</u> at 308-309. The debtor claimed the cash surrender value of the two life insurance polices as exempt in his bankruptcy proceedings. <u>Id.</u> The trustee objected on the grounds that the debtor converted non-exempt property into exempt property with the intend to hinder, delay, or defraud creditors. <u>Id.</u> The bankruptcy court disallowed the exemption and upheld the trustee's objection to exemptions. <u>Id.</u>

The present case is similar to <u>Miller</u>, inter alia, because the debtor possessed intent to defraud creditors when he paid off loans against the life insurance policies, and the loans were not due to be paid.

_____

[11](...continued)
voiding transfers unsupported by reasonably equivalent value is to protect creditors against the depletion of a bankrupt's estate. <u>Id.</u> Therefore, this provision does not authorize voiding a transfer which confers an economic benefit upon the debtor, either directly or indirectly. <u>Id.</u> In such a situation, the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer. <u>Id.</u> (Internal citations omitted.)

In sum, the Lowery case and other cases cited by the Debtors were not binding on the bankruptcy court and such cases are not an impediment to affirming the bankruptcy court's decision to disallow the Debtors' claimed exemption in this appeal.  This Court will not accept the Debtors' rigid proposition that the Debtors' receipt of value for their expenditure of $8,897.40 barred the bankruptcy court from finding fraud.  Furthermore, this Court reads the relevant Florida Statutes to determine that the issue of whether a debtor receives value from the transaction is just one factor, among many, that courts may consider in evaluating whether a debtor acted with fraudulent intent in converting non-exempt assets into exempt assets.[12]

**B.    The Badges of Fraud**

As stated above, the bankruptcy court determined that Mrs. Kelley transferred non-exempt assets into exempt assets with the intent to hinder, delay, or defraud creditors.  In addition, the bankruptcy court determined that the payment of $8,897.40 was marked by several of the "badges of fraud" contained in Florida Statute § 727.105(2): (1) Mrs. Kelley retained control over the $8,897.40 because she could borrow against the policy at any time; (2) the

_____

[12] Although it would have been helpful for the bankruptcy court to have discussed the relevance of the value received by the Debtors in exchange for their expenditure of the $8,897.40, the bankruptcy court's decision was not rendered erroneous or otherwise incorrect due to this omission.

Debtors were insolvent at the time of the $8,897.40 payment to the Insurance Company; (3) the timing of the payment of $8,897.40 to the Insurance Company was less than two months prior to the Debtors filing for bankruptcy; and (4) the loan was not due to be repaid at the time of the transfer of the $8,897.40 to the Insurance Company.

### 1.   <u>Control Over the Disputed $8,897.40</u>

The Debtors assert that, contrary to the bankruptcy court's finding, Mrs. Kelley did not continue to have control over the $8,897.40 after the payment to the Insurance Company.

In support of the proposition that the Debtors retained control over the cash surrender value of the Insurance Policy, the bankruptcy court relied on <u>In re Jennings</u>, 332 B.R. 465 (Bankr. M.D. Fla. 2005).   In <u>Jennings</u>, the debtor was in the gun design, manufacturing, and distribution industry, and the creditor was an individual injured by the accidental discharge of a gun manufactured by the debtor. <u>Id.</u> at 466.   The creditor filed suit against the debtor in California and obtained a jury verdict in excess of twenty-one million dollars. <u>Id.</u> at 468. During the lawsuit, the debtor purchased a $500,000 annuity and then filed for bankruptcy. <u>Id.</u>   The debtor claimed the annuity as an exempt asset. <u>Id.</u> Pursuant to the terms of the annuity, the debtor retained the right to have access to the $500,000 for a 10% penalty.  <u>Id.</u> at 470.   The creditor objected to the exemption, and the bankruptcy court agreed that the claimed exemption of the annuity should be disallowed. <u>Id.</u>

The bankruptcy court in _Jennings_ reasoned that the debtor purchased the annuity for the purpose of hindering, delaying, and defrauding creditors. _Id._ at 472.  Specifically, the bankruptcy court observed that the debtor retained control over 90% of the annuity, the annuity was purchased after the creditor filed a substantial lawsuit against the debtor, against which the debtor was not insured, and the debtor had not previously set aside money for retirement. _Id._ The bankruptcy court therefore determined that the annuity purchase was a fraudulent conversion of non-exempt assets into exempt assets and disallowed the claimed exemption. _Id._

The Debtors assert that _Jennings_ is factually inapposite to the present case.  In _Jennings_, the debtor purchased the annuity when he was on the brink of financial ruin, with a multi-million dollar lawsuit pending and millions of dollars in assets to loose.  In contrast, Mrs. Kelley set up the Life Insurance Policy years prior to filing for bankruptcy, and it was her loan repayment that triggered the chain of events leading to this appeal.

This Court acknowledges that there are some factual differences between the present case and the _Jennings_ case.  Nonetheless, the bankruptcy court's determination that the Debtors in the present case could essentially borrow from or cash in the Insurance Policy and regain control over the $8,897.40, similar to _Jennings_' continued control over the annuity funds, is correct.

## 2. <u>Insolvency and Other Considerations</u>

It is not disputed that the Debtors were insolvent when Mrs. Kelley paid the $8,897.40 to the Insurance Company, and it was appropriate for the bankruptcy court to take the Debtors' insolvency into consideration in rendering its opinion.[13] The Debtors assert that insolvency at the time of the transaction, absent other badges of fraud, is insufficient to support a fraud finding.   It is unnecessary for this Court to address this argument because the bankruptcy court correctly established the existence of other factors indicative of fraud.

It is not disputed that the Mrs. Kelley made the payment of $8,897.40 to the Insurance Company within two months of filing for bankruptcy jointly with her husband.

It is not disputed that the loan was not "due" when Mrs. Kelley paid the $8,897.40 to the Insurance Company.  The Debtors assert that interest was piling up and that they feared that they could lose the policy.  However, the fact that a loan is accruing interest does not equate to the loan being "due."

The Debtors assert that there is nothing in the Bankruptcy Code or binding precedent that prohibits the transfer of a non-exempt asset to an exempt asset, even on the eve of filing for bankruptcy.

---

[13] Mrs. Kelley testified during her deposition that she was unable to pay her debts as they became due from October 2004 through October 2005. (Debtors' Dep. Tr. at 8:1-6.)

The Trustee cites In re Levine, 134 F.3d 1046 (11th Cir. 1998) in opposition to the Debtors' contentions.

In Levine, the debtors were aware of the fact that they were on the brink of losing a lawsuit, and after consultation with an attorney, the debtors liquified their non-exempt stock portfolio and put the money into exempt annuities Id. at 1048.  The creditor objected to the debtor's claim that the annuities were exempt, and, similar to the Debtors in the present case, the debtors in Levine asserted that the mere conversion of non-exempt property into exempt property was not prohibited by the laws of Florida or the Bankruptcy Code.  Id. As in the present case, the bankruptcy court held an evidentiary hearing, and after judging the credibility and demeanor of the witnesses, determined that the debtors converted their non-exempt assets into exempt assets with fraudulent intent to harm creditors.   Id. at 1053.   The debtors appealed to the district court, and the district court affirmed the bankruptcy court.  The debtors appealed the district court's order affirming the bankruptcy court, and the Eleventh Circuit affirmed both the bankruptcy court and district court. Id. at 1054.

In this case, after a hearing, including the live testimony of Mrs. Kelley, the bankruptcy court determined that Mrs. Kelley transferred non-exempt property into exempt property with the intent to hinder, delay, or defraud creditors.  This Court affirms that factual determination, and the bankruptcy court's legal analysis of

the relevant Florida statutes and Bankruptcy Code provisions leading to the disallowance of the claimed exemption.

**C.    The Scope of the Bankruptcy Court's Orders**

The Debtors assert that the bankruptcy court's Findings of Fact and Conclusions of Law (B.R. Doc. # 60), Order Sustaining in Part Trustee's Amended Objections to Debtors' Claim of Exemptions (B.R. Doc # 62), and Order Granting Trustee's Motion for Turnover of Property to the Bankruptcy Estate (B.R. Doc. # 61) apply only to Mrs. Kelley, and not to Mr. Kelley, because Mrs. Kelley wrote the $8,897.40 check to the Insurance Company.  However, it is undisputed that the $8,897.40 check was written on a joint Wells Fargo account held by both of the Debtors.

The Debtors argue "writing a check on a joint account is not sufficient to establish that David L. Kelley was a principal, agent or active marital participant in Linda N. Kelley's repayment of the secured life insurance loan. . . . [T]he Bankruptcy Code does not allow the attribution of intent from one spouse without specific evidence of the spouse's specific actions. First U.S.A. v. Savage, 176 B.R. 614, 615 (Bankr. M.D. Fla. 1994).

In Savage, the debtor's wife, without his knowledge, forged his signature on a credit card application. Id. She then wrote a convenience check on the account to pay off an existing balance on a different credit card. Id.  A creditor tried to persuade the bankruptcy court to deny the husband's discharge as to the debt

-24-

incurred when the wife forged the debtor's name on the convenience check. Id. The bankruptcy court ruled in favor of the debtor finding that the wife's fraud could not be imputed to the debtor solely due to marital relationship between husband and wife without a business partnership or other agency relationship. Id. at 616. The bankruptcy court in Savage relied upon the decision of In re Reed, 700 F.2d 986, 993 (5th Cir. 1983)("The Code does not allow attribution of intent from spouse to spouse").

In response, the Trustee submits that the bankruptcy court's rulings correctly apply to both Debtors because the Debtors' schedules and statement of affairs reveal that the check was written on a Wells Fargo account that belongs to both Debtors. This Court agrees that the money that was used to pay the Insurance Company was owned by both Debtors, and the evidence before the this Court supports the Trustee's contention.

In addition, this Court's review of the deposition testimony offered by the Debtors on February 16, 2006 shows that the Debtors were in business together and, pursuant to Savage,[14] the bankruptcy

---

[14]As explained in Savage, "A fraud by an agent can be imputed to the debtor to except a debt from the discharge pursuant to Section 523(a)(2)(A). Courts have in fact imputed liability under Section 523 fraud of one spouse to the other spouse based on agency relationship. . . . These cases . . . involving husband and wife, also involved some sort of business or partnership relationship between the husband and the wife." 176 B.R. at 615-616.

court could have correctly imputed fraud from Mrs. Kelley to Mr. Kelley predicated on an agency relationship.[15]

Accordingly, in this case, where the Debtors filed for protection from creditors via a joint petition under Chapter 7 of the Bankruptcy Code, were operating a small business together, and wrote the disputed check on a joint account, this Court finds that the bankruptcy court's decision to extend his disallowance of the exemption and turnover of property to apply to both Debtors to be appropriate.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED** that:

(1) The Findings of Fact and Conclusions of Law (B.R. Doc. # 60), Order Sustaining in Part Trustee's Amended Objections to Debtors' Claim of Exemptions (B.R. Doc. # 62), and Order Granting Trustee's Motion for Turnover of Property to the Bankruptcy Estate (B.R. Doc.

---

[15] Mr. Kelley explained that he and Mrs. Kelley are the only two employees and shareholders of their company, Power Management Engineering, Inc. (Debtors Dep. Tr. at 10:9-14). Mrs. Kelley testified "our vehicles are owned by the corporation." (Id. at 14; 11.) In addition, Mrs. Kelley testified that both she and Mr. Kelley own the stock in Cornerstone Bridge, Inc., a company that she set up (Id. at 15;3-10). In addition, the Debtors are partners of "Cornerstone IV, LP." (Id. at 17:8-10.)

# 61) entered by the bankruptcy court on August 29, 2006, are

**AFFIRMED.**

DONE and **ORDERED** in Chambers, in Jacksonville, Florida, this

<u>30th</u> day of August, 2007.

Virginia M. Hernandez Covington
_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:
counsel of record
George L. Proctor, United States Bankruptcy Judge